Filed 3/9/16  P. v. Bradley CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. AL LEE BRADLEY, Defendant and Appellant. | F068267 (Super. Ct. No. BF142742A) **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, R. Todd Marshall and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Al Lee Bradley appeals from his conviction and sentence for voluntary manslaughter.  He raises four issues in this appeal.  First, he argues the trial court prejudicially erred in instructing the jury with CALCRIM No. 362, a consciousness-of-

guilt instruction.  Next, he argues the court prejudicially erred in failing sua sponte to instruct the jury with CALCRIM No. 506, regarding an affirmative defense to murder (and lesser-included offenses) that applies when a defendant acted to defend a person from harm within a home or on property.  Bradley also challenges the court's imposition of the upper term of 11 years on his voluntary-manslaughter conviction, disputing its evaluation of factors in aggravation and mitigation.  Finally, Bradley argues that the court's imposition of restitution and parole-revocation fines of $280 each violates the ex post facto clauses of the federal and state Constitutions.  We reject each of Bradley's contentions.  The judgment is affirmed.

### *PROCEDURAL HISTORY*

In an information filed on December 11, 2012, and orally amended during a hearing on September 9, 2013, the Kern County District Attorney's Office charged Bradley with the first degree murder of Ricky Wofford.  (Pen. Code,[1] § 187, subd. (a).)  The information further alleged that Bradley personally and intentionally discharged a firearm causing the death of a person.  (§ 12022.53, subd. (d).)

The case proceeded to jury trial, and the jury found Bradley not guilty of first and second degree murder.  The jury rejected Bradley's defense of perfect self-defense, finding that the prosecution had proved it did not apply beyond a reasonable doubt.  The jury found Bradley guilty of the lesser-included offense of voluntary manslaughter.  (§ 192, subd. (a).)  The jury also found true a lesser-included gun enhancement.  (§ 12022.5, subd. (a).)

The trial court sentenced Bradley to an aggregate term of 21 years in prison, computed as follows:  the upper term of 11 years on the voluntary-manslaughter conviction and an additional 10 years on the gun enhancement.

---

[1]Subsequent statutory references are to the Penal Code unless otherwise specified.

## *FACTS*

Bradley was 25 years old at the time of the offense.  He had two daughters, ages six and three, with Francesca Kindred, his ex-girlfriend.  Bradley and Kindred shared custody of the girls through an informal arrangement.  The girls stayed with Kindred during the work week and spent the weekends with Bradley.  Kindred and Bradley did not get along and frequently argued over the children.

Kindred met and started dating Ricky Wofford, a member of the Eastside Crips gang, around December 25, 2011.  Wofford had been released from prison earlier that month, after serving a sentence for a home-invasion robbery.  Wofford moved in with Kindred and the girls in January 2012.  Bradley was extremely concerned about a gang member living under the same roof as his daughters.

Bradley testified that Wofford and Kindred repeatedly threatened Bradley and his girlfriend, Tiffany Terry, during the first six months of 2012, in connection with disputes about the girls.  Both Kindred and Wofford told Bradley that Wofford was a high-ranking gang member who could attack Bradley at any time.  Bradley described one of the threats as follows:  "Their exact words were we know where you stay.  We can have Eastside Crips come by your house, kick in your front door.  They was, like, taunting me.  Basically, like we got your number.  We know where you stay."

On Friday, June 22, 2012, Bradley went to Kindred's apartment to collect the girls for a regular visit.  Wofford came up to Bradley as he pulled up and said, "You got one more time.  You got one more time.  That's on Eastside Crip.  You got one more fucking time."  Bradley explained his reaction to Wofford's comments as follows:  "I took it as a death threat, that I got one more time to do something that they didn't like or they would kill me."  As Bradley drove away with the girls, Wofford was "standing there with his hands in his pants," which Bradley interpreted as a reference to the fact that Wofford "had a gun on him."

3.

Kindred called Bradley on Sunday, June 24, 2012, to ask what time he planned to bring the girls back. Bradley did not want his daughters to be around Wofford, so he told Kindred he wanted the girls to stay with him for the entire summer. Kindred protested and indicated she was coming over to get the kids. She said, "I'm bringing Ricky, and you already know what the fuck he told you. You already know." Bradley pleaded with Kindred not to bring Wofford over because he was scared of Wofford and felt nervous about confronting him.

After Bradley's phone call with Kindred, Tiffany Terry and the children got ready to leave the apartment. Terry drove away with the girls just as Kindred, along with Wofford and Kindred's niece, Aubrie Massey, arrived at Bradley's apartment complex to collect them. Kindred and Massey saw Terry drive away; Massey noted the girls were in the car with Terry.

Bradley was waiting at the gate to the apartment complex. Kindred and Massey got out of the car, walked up to him, and began arguing about the kids. Bradley held the handle of the gate, which was four or five feet high, to keep it closed. Kindred and Massey pulled on the gate, trying to get inside. Bradley repeatedly told them to leave.

Wofford got out of the car and came to the gate. Bradley took a swing at Wofford and Wofford jumped over the gate. Wofford and Bradley fought in the courtyard of the apartment complex. Wofford lost his balance and Bradley was kicking him in the face. Kindred and Massey reached over the gate, opened it, came inside the complex, and began pulling and pushing Bradley. Massey called the police. Wofford began to beat up Bradley. Three witnesses from nearby apartments said Wofford shouted he was going to "murk" Bradley, which they understood as a threat to shoot Bradley. At some point, the physical fight ended and Wofford, Kindred, and Massey started to walk out of the complex gate toward Kindred's car. Bradley ran into his apartment and emerged with a single-shot .410-gauge shotgun, which he had obtained the previous Friday from a family

4.

member.[2]  Bradley had stashed the shotgun in his living room to have it handy, just before he came out to meet Kindred and Wofford at the complex gate.

Wofford taunted Bradley, "[W]hat you gonna do?  You got a burner?"  As Bradley loaded the shotgun, Wofford started running away.  As Wofford ran through the gate of the apartment complex, Bradley shot him in the lower back.  Wofford stumbled a little, grabbed his back, but continued running away.  Bradley testified that he reloaded the shotgun and went after Wofford as he was afraid that Wofford would retrieve a gun from Kindred's car.  Wofford, however, ran past Kindred's parked car and across a busy street.  He tripped on the street's center divider and fell to the ground.  Bradley came over and shot Wofford in the neck at close range as Wofford lay on the ground shielding his head with a raised arm.  Wofford died at that spot from the gunshot wounds.  As Bradley walked away, he yelled out, "don't fuck with my kids."

Bradley walked back to the courtyard area of his apartment complex, set the gun down, and waited for the police.  When Officer Steven Glenn, the first police officer on the scene, arrived, Bradley shouted, "I had to shoot that motherfucker for my kids."[3]  Bradley was taken to the police station where he gave a detailed statement to the police.  In this statement, Bradley emphasized that Wofford repeatedly threatened to kill him

---

[2]Kindred, Amanda Rodriguez, and Teresa Fuentes testified that after the fight broke up, Kindred, Massey, and Wofford headed out of the apartment complex gate.  Teresa Fuentes clarified in her testimony that Wofford and Bradley split apart after the fight ended, with Wofford walking out toward the car and Bradley walking to his apartment.  Bradley testified that Wofford followed Bradley as Bradley ran to his apartment to retrieve the shotgun.

[3]Other witnesses besides Officer Glenn also testified about Bradley's statements at the scene.  Teresa Fuentes testified that Bradley said "nobody would hurt his kids again."  Samantha Rodriguez testified that "[Bradley said] the next time [Wofford will] know … not to do this .…"  Amanda Rodriguez testified that "[Bradley] said that nobody was gonna mess with his kids, and that's about it."  From the questions put to Amanda Rodriguez at trial, it appears she had mentioned in a prior statement to the police that, at the scene, Bradley stated he had killed Wofford for his kids and in self-defense.

during their final altercation and that Bradley was afraid for his life, although he acknowledged that he had yelled, "don't fuck with my kids," at Wofford after shooting him in the street. At trial, Bradley similarly testified that he acted in self-defense: "I was scared for my life. I had to protect myself. I ran to get my shotgun 'cause this guy was coming to kill me. He's following me in my house.… [¶] … [¶] … He followed me after he just beat me up and told me he was going to kill me. I took it serious. This guy is coming to kill me. I wanted to grab my gun and I'm going to protect myself. [¶] … [¶] [M]y life was in danger all the way until that second shot, so I fired that second shot." On cross-examination, the prosecutor asked Bradley whether it was true that Bradley told Officer Glenn, that "I did it; I shot that mother F'er; I had to for my kids."[4] Bradley responded, "No, I shot him 'cause he was trying to kill me and take me away from my kids. He was trying to take me away from my family. [¶] … [¶] … I killed him because he was trying to kill me and take me away from my wife and kids."

Adel Shaker, a forensic pathologist, performed an autopsy on Wofford. He testified that, while the first shot, i.e., the shot to Wofford's lower back, would eventually have caused Wofford to bleed to death, the second shot, i.e., the shot to Wofford's neck, severed his carotid artery and caused his death in a matter of minutes.

Finally, Officer Richard Dossey, Jr., obtained a search warrant for and searched Kindred's car on the night of the shooting, "while [the police] were still at the scene and had control of it." Dossey testified that he "was looking for any type of weapons, any type of indicia for any gang affiliation," but "did not locate anything close to those items at all." Dossey specifically looked for indications of loose panels and any tampering with the panels in the car, but "did not find any hidden compartments or hidden items .…"

---

**4**Specifically, the prosecutor asked the following question: "Sir, isn't it true that when the cops showed up, when Steve Glenn showed up—and he was that guy who testified Friday, kind of young guy, bald … [h]e said that you said I did it; I shot that mother F'er; I had to for my kids."

## DISCUSSION

### I.   The trial court properly instructed the jury with CALCRIM No. 362

Bradley argues that the trial court erred in instructing the jury, pursuant to CALCRIM No. 362, that potential false or misleading statements by a defendant may indicate a consciousness of guilt on his part. Specifically, Bradley argues that CALCRIM No. 362 was unwarranted because "there was no evidentiary support for the instruction." Instructional errors present questions of law and are reviewed de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569; *People v. Hannon* (1977) 19 Cal.3d 588, 597, limited on other grounds in *People v. Martinez* (2000) 22 Cal.4th 750, 762-764 [whether any given set of facts supports particular inference of consciousness of guilt is question of law].)

### A.   Background

During the jury-instruction conference, the prosecution requested the court to instruct the jury with CALCRIM No. 362. Defense counsel objected, asserting that he did not "think [his] client ever made a false statement." The prosecutor countered as follows:

> "Judge, the defendant's initial statements, as you may recall, at the time he was arrested, what [Officer] Steven Glenn referred to, was the defendant stating I did it, I shot that mother F'er, I had to for my kids. Nothing about I had to protect myself; I had to for my own self. It was about his kids. [¶] When he is talking to the police, and certainly completely in his testimony, that suddenly morphs into it's to protect myself. [¶] He can't have it both ways. So for that reason I am asking that it be given."

The judge ruled in favor of instructing the jury with CALCRIM No. 362, noting its conditional phrasing whereby the jury must initially decide if the statement in question was false or misleading before considering whether it indicated any consciousness of guilt on Bradley's part. Subsequently, the jury was instructed with CALCRIM No. 362, as follows:

7.

"If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

### B.    Analysis

"'False statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt. [Citations.]'" (*People v. Flores* (2007) 157 Cal.App.4th 216, 221, quoting *People v. Showers* (1968) 68 Cal.2d 639, 643.) The false nature of the defendant's statement may be shown by inconsistencies in the defendant's own testimony, his or her pretrial statements, or by any other prosecution evidence. (*People v. Kimble* (1988) 44 Cal.3d 480, 498; *People v. Edwards* (1992) 8 Cal.App.4th 1092, 1103 ["The falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is not inconsistent with defendant's testimony at trial."].[5]) Accordingly, "[a] trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions. [Citation.]" (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366.)

Here, Bradley spontaneously exclaimed, when the police first arrived on the crime scene, that he had killed Wofford for the sake of his daughters. Subsequently, Bradley gave a more self-serving statement to the police in which he alleged he had acted in self-defense. In the second statement, Bradley emphasized that, during the altercation, both before and after Bradley fired the first shot, Wofford was threatening to kill him, and

---

[5]Bradley's reliance on *People v. Rubio* (1977) 71 Cal.App.3d 757, 769, for the proposition that a consciousness-of-guilt instruction is not applicable where the false statement in question is consistent with the defendant's trial testimony, is unavailing in light of the contrary holdings of *Kimble* and *Edwards*, which we find persuasive.

Wofford's "death threat[s]" spurred Bradley to kill him.  Specifically, in his later statement, Bradley described the events leading up to the shooting as follows:

> "[Wofford's] on top of me telling me, 'I'm going to kill you, you bitch ass nigger, I'm going to kill you.'  He punches me in my face, 'I'm going to kill you bitch ass nigger.'  I don't know how I got from under him.  Maybe I wiggled or something.  When I got from under him I started running towards my door.  He started following me toward my door.  That's when I came out with that [shotgun].  He said, 'Oh you got a gun?  What you going to do with that?'  That's when I shot him right here.  When I shot him right there he didn't fall he started to, to me I thought he was going to go to Francesca's car and get something or something.  'Cause when they pulled up … he never really got all the way out of the car.  It kind of seemed like he had something.…  [¶] … [¶]  So when I shot him he started going out the gate towards her car and then that when he was like I'm going to get you I'm going to get you it's on now.  And I still was behind him and I just felt like if I didn't [shoot] him again or try to take him out he would of came and did lord knows to me.  I just felt like I felt like they would of got me.  So I chased behind him after he told me that he'll be back and I shot him again and he fell in the street."

Although in both of his pretrial statements Bradley admitted he killed Wofford, the apparent change in the substance and emphases of these respective statements is sufficient to raise an inference that Bradley was aware of his guilt and, in his later statement, sought to portray the killing as a justifiable homicide.  Accordingly, the court did not err in instructing the jury with CALCRIM No. 362.  Under the conditional language of CALCRIM No. 362, the jury would initially have to decide whether Bradley's second pretrial statement was, in fact, false or misleading; if it found the statement was false or misleading, it could then consider whether the statement indicated an awareness of guilt on Bradley's part and, in turn, what meaning and weight to ascribe to the statement.  Under the circumstances, it was appropriate to permit the jury to make these determinations.

Bradley also challenges CALCRIM No. 362 on various due process grounds.  He argues that (1) CALCRIM No. 362 improperly "allowed the jurors to give Bradley's

statement[] whatever weight they chose, even to make it the determinative factor in their deliberations"; (2) CALCRIM No. 362 is unconstitutional because it states that a defendant's "'conduct may show that he was aware of his guilt'" (italics omitted) while similar instructions that have passed constitutional muster state that a defendant's conduct may show a consciousness of guilt and that the difference in phrasing is material; (3) CALCRIM No. 362 impermissibly reduces the prosecution's burden of proof; (4) CALCRIM No. 362 improperly permitted the jury to draw irrational inferences of guilt; and (5) CALCRIM No. 362 is an improper pinpoint instruction that favors the prosecution.

All of Bradley's arguments are unavailing because the California Supreme Court has held that CALCRIM No. 362 is a correct statement of the law and does not run afoul of constitutional strictures. (*People v. Howard* (2008) 42 Cal.4th 1000, 1025 ["We have repeatedly rejected arguments attacking [CALCRIM No. 362]]," citing *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [rejecting challenges to CALJIC No. 2.03,[6] a "consciousness of guilt" instruction that was predecessor of and basically identical to CALCRIM No. 362].) Contrary to Bradley's assertion, CALCRIM No. 362 does not permit the jury to make the falsity of Bradley's statement the "determinative factor in their deliberations" as it explicitly instructs that "evidence that the defendant made [a false or misleading] statement cannot prove guilt by itself." Furthermore, Bradley's

---

[6]CALCRIM No. 362 is the successor to CALJIC No. 2.03, and the two instructions are substantively identical. (See *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104 ["Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362, … none is sufficient to undermine our Supreme Court's approval of the language of these instructions."].) Former CALJIC No. 2.03 provided as follows: "If you find that before this trial [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

claim that CALCRIM No. 362 is unconstitutional because it employs the phrase "aware of his guilt" instead of "consciousness of guilt" is foreclosed by *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, which found no constitutional infirmity on account of the term "aware of his guilt" in CALCRIM No. 372, a related "flight" instruction. Under *Hernandez Rios*, the use of the term "aware of his guilt" in the CALCRIM instructions on false statements, flight, and fabrication of evidence, respectively, is entirely consistent with the use of the term "consciousness of guilt" in the predecessor line of CALJIC instructions on the same topics. (*Hernández Ríos, supra,* at pp. 1158-1159.)

Nor does CALCRIM No. 362 improperly reduce the prosecution's burden of proof. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.) In *Coffman*, the defendant challenged CALJIC Nos. 2.04 and 2.06, which relate to fabrication and suppression of evidence by a defendant, respectively. (*Coffman, supra,* at pp. 101-102.) CALJIC Nos. 2.04 and 2.06 provide that conduct relating to fabrication and suppression of evidence "may be considered by [the jury] as a circumstance tending to show consciousness of guilt," but further specify that "[such] conduct is not sufficient by itself to prove guilt." The *Coffman* court held that, because these instructions required the jury "to infer a consciousness of guilt only if it first found from the evidence that defendants had engaged in the described conduct, and further informed the jury such evidence was not, in itself, sufficient to prove guilt, the instructions properly guided the jury's consideration of the evidence and did not lessen the prosecution's burden of proof." (*Coffman, supra,* at p. 102). CALCRIM No. 362 similarly does not lessen the prosecution's burden of proof as it also explicitly instructs that the jury must first determine whether the defendant's statement was false or misleading before it can consider whether the statement indicated an awareness of guilt on the part of the defendant, and further specifies that the statement "cannot prove guilt by itself."

The California Supreme Court has also held that CALCRIM No. 362 does not permit the jury to draw irrational inferences of guilt when there is a basis for the jury to

11.

make an inference that a defendant made a self-serving statement to protect himself. (*People v. Howard*, *supra*, 42 Cal.4th at p. 1025.)  Finally, *People v. McGowan, supra,* 160 Cal.App.4th 1099, squarely holds that CALCRIM No. 362 is not an improper pinpoint instruction.  (*McGowan, supra,* at p. 1104 ["CALCRIM No. 362 is not an unlawful 'pinpoint' instruction"]; see also *People v. Alexander* (2010) 49 Cal.4th 846, 922 [noting court's consistent rejection of contention that standard consciousness-of-guilt instructions were improperly argumentative in "pinpoint[ing]" prosecution's argument regarding how jury should view certain evidence].)

We conclude the trial court did not err in instructing the jury with CALCRIM No. 362.  Further, assuming arguendo the trial court erred by instructing with CALCRIM No. 362, the error was harmless.  First, the instruction would apply only if the jury initially determined that Bradley made a false or misleading statement regarding the charged crime.  Second, even were the jury to make that determination, the inference permitted by CALCRIM No. 362 is a permissive one as the instruction specifies that, "[i]f you conclude that the defendant made the statement, it is up to you to decide its meaning and importance."  The jury was *not* instructed to infer Bradley *was* aware of his guilt if it determined that he knowingly made a false or misleading statement.  Rather, the jury was free to consider the meaning and importance of such a determination.  The jury was also instructed that Bradley's guilt could not be proved solely by evidence that he made a false or misleading statement.  In light of the conditional and permissive nature of the instruction, and of our consideration of the entire record, we cannot conclude it is reasonably probable Bradley would have obtained a more favorable verdict had the trial court not instructed the jury with CALCRIM No. 362.  (*People v. Rankin* (1992) 9 Cal.App.4th 430, 436; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II. *The trial court's failure to instruct the jury on the affirmative defense of justifiable homicide in defense of property was harmless*

Bradley argues the trial court prejudicially erred in failing sua sponte to instruct the jury pursuant to CALCRIM No. 506, which is entitled "Justifiable Homicide: Defending Against Harm to Person Within Home or on Property." We review claims of instructional error de novo. (*People v. Guiuan*, *supra*, 18 Cal.4th at p. 569.) We are not persuaded by Bradley's argument because, even if the court erred in failing to instruct the jury pursuant to CALCRIM No. 506, any error was clearly harmless, under both the *Watson* and *Chapman* standards, as the court instructed the jury with CALCRIM No. 505, the self-defense instruction. (See *People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18, 24.) Both CALCRIM Nos. 505 and 506 pertain to the justifiability of the homicide at issue. Under the facts of the instant case, the determinative elements of CALCRIM Nos. 505 and 506 are substantively identical. Consequently, the court's failure to instruct the jury with CALCRIM No. 506 was not prejudicial to Bradley.

CALCRIM No. 506 provides in relevant part:

"The defendant is not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter) if (he/she) (killed/attempted to kill) to defend (himself/herself) [or any other person] in the defendant's home. Such (a/an) [attempted] killing is justified, and therefore not unlawful, if:

"1. The defendant reasonably believed that (he/she) was defending a home against _____ <*insert name of decedent*>, who (intended to or tried to commit _____ <*insert forcible and atrocious crime*>/ [or] violently[[,] [or] riotously[,]/ [or] tumultuously] tried to enter that home intending to commit an act of violence against someone inside);

"2. The defendant reasonably believed that the danger was imminent;

"3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger;

13.

"AND

"4.    The defendant used no more force than was reasonably necessary to defend against the danger."

CALCRIM No. 505 is entitled, "Justifiable Homicide:  Self-Defense or Defense of Another," and the jury was instructed in relevant part:

"The defendant is not guilty of murder or voluntary manslaughter if he was justified in killing someone in self-defense or defense of another. [¶]  The defendant acted in lawful self-defense or defense of another if:

"One, the defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

"Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

"And, third, the defendant used no more force than was reasonably necessary to defend against that danger."

CALCRIM Nos. 505 and 506 both instruct on similar affirmative defenses, i.e., self-defense or defense of another (CALCRIM No. 505) and defending against harm to a person within a home or on property (CALCRIM No. 506), respectively, and in light of Bradley's testimony, have overlapping elements except for the requirement under CALCRIM No. 506 that a defendant have acted to defend his home, as well as a person within the home (or property).  Here, Bradley testified he acted to defend himself from Wofford, who was "coming to kill" him;[7] his girlfriend and his children had already driven away from the premises.[8]  Moreover, there was no dispute that Wofford and Bradley got into a physical fight and that Bradley grabbed a gun from inside his home

---

[7]In light of Bradley's testimony that he acted to defend himself from Wofford, who was "coming to kill" him, "the forcible and atrocious" crime that was at issue for purposes of CALCRIM No. 506 was murder.  (See CALCRIM No. 506, element 1; *People v. Ceballos* (1974) 12 Cal.3d 470, 478 ["Examples of forcible and atrocious crimes are murder, mayhem, rape and robbery."].)

[8]Bradley testified that, as Kindred, Massey, and Wofford pulled up to his apartment complex, his girlfriend, Tiffany Terry, drove away with his daughters.

14.

and shot Wofford, initially, as Wofford was running through the gate of Bradley's apartment complex and again, fatally, when Wofford was lying in the street some distance away from the complex. Bradley's primary theory of defense in the case thus was that he acted in self-defense.

Bradley addressed the circumstances of the shooting in detail in his trial testimony. Regarding the first shot, Bradley testified as follows: "I was scared for my life. I had to protect myself. I ran to get my shotgun 'cause this guy was coming to kill me. He's following me in my house. [¶] … [¶] … He followed me after he just beat me up and told me he was going to kill me. I took it serious. This guy is coming to kill me." As to the second shot, Bradley similarly stated he thought Wofford would kill him. The prosecutor asked Bradley on cross-examination why he fired the second and fatal shot when Wofford was lying, wounded and unarmed, in the street. Bradley answered, "I [thought] that I just pissed this guy off. He's gonna fucking kill me. I better kill him or I'm gonna be dead." The prosecutor then asked Bradley how he thought Wofford could kill him at that point given Wofford's condition. Bradley responded, "I don't know how he was gonna kill me. I just know that I had to end this." The prosecutor continued to press Bradley, asking how Wofford could have killed Bradley when Wofford was wounded, unarmed, and had a loaded shotgun pointed at him. Bradley, replied, "I don't know how. I just know what he told me, that he was gonna kill me, and I know that I believed it and I took it serious and my life was in danger all the way until that second shot, so I fired that second shot."

The jury ultimately rejected Bradley's claim of self-defense and convicted him of voluntary manslaughter pursuant either to an imperfect self-defense or provocation/heat-of-passion theory.[9] Given the overlapping elements of CALCRIM Nos. 505 and 506 and

[9]The jury was instructed as to both imperfect self-defense and heat-of-passion defenses, but the verdict form does not reveal which theory the jury credited in convicting Bradley of voluntary manslaughter.

Bradley's testimony as to why he fired the fatal shot, the jury would ultimately have to consider under both these instructions whether, at the time Bradley fired the fatal shot, he reasonably believed he was in imminent danger of being killed by Wofford, and the use of deadly force was necessary to protect himself from the danger. Under the applicable facts, both instructions would mandate the same analysis. Therefore, even if the court erred in failing to instruct the jury with CALCRIM No. 506, the error was harmless under any standard.[10] (See *People v. Wright* (2006) 40 Cal.4th 81, 98-99 [error in failing to instruct jury is harmless under any standard when jury necessarily decides factual questions posed by omitted instruction under other properly given instruction]; *People v. Manriquez* (2005) 37 Cal.4th 547, 582-582.) Furthermore, here the jury was instructed pursuant to CALCRIM No. 3475, which is entitled, "Right to Eject Trespasser from Real Property," as follows:

> "The lawful occupant of a property may request that a trespasser leave the property. If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to the property or the occupants, the lawful occupant may use reasonable force to make the trespasser leave.
>
> "Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave. If the trespasser resists, the lawful occupant may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.
>
> "When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation, with similar knowledge, would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

---

[10]Indeed, CALCRIM No. 505 is the more appropriate instruction in light of Bradley's testimony that he acted to defend himself. Bradley did not testify that he acted to defend his home against Wofford.

"The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable."

Defense counsel referenced this instruction in his closing argument.

Since we have found that Bradley suffered no prejudice from the court's failure to instruct the jury with CALCRIM No. 506, we also reject his claim that his counsel was ineffective in agreeing with the court that this instruction was superfluous. Finally, Bradley challenges CALCRIM No. 506 in other respects, but we need not address those claims in light of our determination that Bradley was not prejudiced by the trial court's failure to give this instruction.

### III. Restitution and parole-revocation fines

Bradley argues the trial court violated the ex post facto clauses of the state and federal Constitutions by imposing a $280 restitution fine and imposing and staying a $280 parole-revocation fine in the same amount. We disagree.

"The Constitution forbids the passage of *ex post facto* laws, a category that includes '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" (*Peugh v. United States* (2013) 569 U.S. ___, ___ [133 S.Ct. 2072, 2077-2078]; see *Collins v. Youngblood* (1990) 497 U.S. 37, 41-42.) "[T]he imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Accordingly, a defendant is entitled to remand if a trial court imposes a restitution order by applying the law of restitution that applied at the time of sentencing, rather than the law applicable at the time the crime was committed. (*Ibid.*)

A sentence, however, "is generally 'unauthorized' where it could not lawfully be imposed *under any circumstance in the particular case*." (*People v. Scott* (1994) 9 Cal.4th 331, 354, italics added (*Scott*).) Here, the plain language of section 1202.4, subdivision (b)(1), in effect when Bradley shot Wofford explicitly required the trial court

17.

to set the restitution fine at "[no] less than two hundred forty dollars," and "not more than ten thousand dollars …." Similarly, the plain language of section 1202.45, subdivision (a), required the trial court to set the parole-revocation fine "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." Accordingly, the trial court lawfully could issue restitution and parole-revocation fines in the amount of $280 under the controlling law in Bradley's case, and, as such, the fines were not unauthorized by law nor were they violations of the ex post facto clause.

Even if Bradley had established that the trial court erred in setting the amount of the fines, his argument has been waived as he did not object at the time of sentencing. "[C]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" are forfeited when they are raised for the first time on appeal. (*Scott, supra,* 9 Cal.4th at p. 353; accord, *People v. Smith* (2001) 24 Cal.4th 849, 852.) While this forfeiture rule does not apply to unauthorized sentences, Bradley's fines were within the range authorized by the controlling sections of the Penal Code. (*Smith, supra,* at p. 852.) As such, the fines were authorized by law and Bradley is not entitled to relief.

Bradley argues, without reference to the record, that the court intended to impose the statutory minimum under sections 1202.4, subdivision (b), and 1202.45. In review of the record, specifically the sentencing transcript, we are unable to uncover such an intention or any ambiguity in this regard.

## IV.    *The court did not abuse its sentencing discretion*

Finally, Bradley disputes the trial court's evaluation of aggravating and mitigating factors in sentencing and contends the court erred in imposing the upper term of 11 years on his voluntary-manslaughter conviction. We disagree.

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court…. The court shall set forth on the record the reasons for imposing

18.

the term selected ….” (§ 1170, subd. (b).)  When “selecting one of the three authorized prison terms referred to in section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision.” (Cal. Rules of Court, rule 4.420(b).)  A single aggravating circumstance is sufficient to make a defendant eligible for an upper term and for the trial court to impose an upper-term sentence.  (*People v. Black* (2007) 41 Cal.4th 799, 813, 815, overruled on other grounds by *Cunningham v. California* (2007) 549 U.S. 270.)  “A trial court may minimize or even entirely disregard mitigating factors without stating its reasons.” (*People v. Salazar* (1983) 144 Cal.App.3d 799, 813.)  There is no requirement that the upper term be supported by aggravating factors that outweigh the mitigating factors.  (Cal. Rules of Court, rule 4.420(b).)  The trial court enjoys broad discretion in its sentencing decisions, subject only to review for abuse of discretion.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

Here the court found four factors in aggravation:  (1) Bradley’s numerous prior convictions as an adult and sustained petitions as a juvenile; (2) the fact that Bradley was on probation at the time the crime was committed; (3) Bradley’s unsatisfactory performance while on juvenile probation; and (4) the fact that the crime at issue involved great violence and callousness (i.e., shooting an unarmed victim as he was running away, and again, at relatively close range, when he was lying wounded on the ground with his arm outstretched).  The court did not abuse its discretion in finding these factors to be aggravating, and any one of them, on its own, was sufficient to support the court’s sentencing decision.  (See Cal. Rules of Court, rule 4.421.)

Bradley contends the court did not properly credit a number of potentially mitigating factors.  However, as the People persuasively explain, whether the factors identified by Bradley are mitigating is, at best, a debatable proposition, and the court could reasonably find that none of them were in fact mitigating.

First, Bradley contends that Wofford was the initiator, aggressor, or provoker of the incident; but the issue is far from clear cut because Bradley refused to hand over his daughters to their mother pursuant to their customary arrangement, threw the first punch at Wofford when they were arguing over the apartment complex gate, and escalated matters by placing a shotgun in his living room just before Wofford came over. (See Cal. Rules of Court, rule 4.423(a)(2).)

Second, Bradley contends "[t]he crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur." (See Cal. Rules of Court, rule 4.423(a)(3).) However, as the People point out, the ongoing tension between Bradley and Kindred over their children's upbringing and Wofford's tendency to intercede on behalf of Kindred could easily have led to a violent altercation at a subsequent point in time.

Third, Bradley argues he was induced by others to participate in the crime. (See Cal. Rules of Court, rule 4.423(a)(5).) While there was substantial evidence that Wofford and Kindred had threatened and antagonized Bradley in the months leading up to the shooting, the judge could reasonably find that Bradley unilaterally escalated matters to a deadly level.

Fourth, Bradley asserts he "exercised caution to avoid harm to persons" when committing the crime. (Cal. Rules of Court, rule 4.23(a)(6).) Bradley warned his neighbors to go inside before the altercation ensued, but the fact remains he fired a shotgun in the courtyard of his apartment complex and again in the middle of a busy street.

Fifth, Bradley argues he voluntarily acknowledged shooting Wofford at the beginning of the criminal process. (See Cal. Rules of Court, rule 4.423(b)(3).) While Bradley admitted from the very beginning he had shot Wofford, in his initial police interrogation he claimed he acted in self-defense. As Bradley's cooperation did not

20.

amount to an unequivocal acknowledgment of wrongdoing, the court could reasonably decline to recognize it as a mitigating factor.

In sum, the trial court did not abuse its discretion in sentencing Bradley to the upper term of 11 years on his voluntary-manslaughter conviction.[11]

### *DISPOSITION*

The judgment is affirmed.

_____

Smith, J.

WE CONCUR:

_____

Hill, P.J.

_____

Gomes, J.

---

[11]As we have resolved this claim on the merits, we need not address Bradley's alternative argument that counsel was ineffective in failing to object to the court's evaluation of aggravating and mitigating factors.